ROBERT L. AND LEONA M. CHESTER, ET AL., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Chester v. Commissioner
Docket Nos. 14299-84, 14324-84, 14325-84, 14328-84, 14329-84, 15227-84, 15228-84, 15240-84, 15915-84, 15916-84, 15932-84, 15933-84, 20675-84, 22153-84, 22336-84.
United States Tax Court
T.C. Memo 1986-355; 1986 Tax Ct. Memo LEXIS 253; 52 T.C.M. (CCH) 78; T.C.M. (RIA) 86355; August 6, 1986. Robert F. Hatfield, for the peltitioners. Rebecca W. Wolfe and Deborah A. Butler, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: These cases were consolidated for purposes of trial, briefing, and opinion. Appendix A sets forth petitioners by name and docket numbers, the tax years involved, the deficiencies for each year, and the place of residence of each individual petitioner. Each of the petitions includes, among other issues, the common issue of the tax consequences of the investment by petitioners in video tapes with religious themes claimed to have been produced by Jesus Is Lord Ministries (JLM), sold to petitioners by DanKryst, a corporation, formed and owned by Dan Chester, and marketed by SWEET, a corporation *257 formed and operated by Ron Davis. In his statutory notice, respondent disallowed each petitioner's depreciation deductions, [1] interest deductions, and investment tax credits incurred as a result of their investments in the JLM tapes. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts along with the supplemental stipulations of facts and attached exhibits are incorporated herein by this reference. The pertinent facts are summarized below. Jesus is Lord Ministries (JLM), is a non-profit organization incorporated in the state of Arkansas in February 1977 as the result of a merger between Jesus is Lord Foundation and the Charles Thompson Evangelistic Association. The principal place of business of JLM was listed in the merger documents as Hardy, Arkansas. The stated purpose or purposes for which JLM was formed were described as "charitable, benevolent, educational, religious, missionary, evangelistic and other religious *258 activities." Charles W. Thompson (Thompson), was listed as the president and resident agent of JLM. Rena Walters (Walters), was the secretary/treasurer of JLM and Bernice Thompson was the vice president. Thompson had worked as a Methodist minister for about 15 years in northern Arkansas. He was ordained as an elder in the Methodist Church. After organizing JLM, Thompson conducted tent crusades [3] from May through October in Arkansas, and also in Kentucky, Louisiana, Illinois, Tennessee, Alabama, Mississippi, Georgia and Missouri. In addition to its tent crusades, JLM operated a thrift shop, a Christian bookstore, a Christian school, and held religious seminars in Hardy, Arkansas. From 200 to 600 people would attend each tent crusade and from 800 to 1,000 would attend the seminars held twice a year. JLM compiled a mailing list of seven to eight thousand persons based upon those individuals who attended the tent crusades and seminars. Petitioner Daniel Chester (Chester), served as Associate Director *259 for JLM from 1978 to the spring of 1984.Sometime in the late summer or early fall of 1980 Thompson asked Chester to contact John Williams (Williams). Williams was described to Chester as a Christian financial consultant. Thompson had learned of a tax shelter program marketed by Williams in Arizona involving audio cassettes and wanted Williams to discuss this program with JLM. [4] Chester contacted Williams and invited him to come to Arkansas to speak with JLM representatives. A meeting with Williams was held in the fall of 1980 attended by Thompson, Walters, Ron Davis (Davis), and Gary Chester (Gary), Daniel's son. Williams explained to those present his concept of marketing audio cassettes to utilize investment tax credits. *260 After meeting with Williams, several JLM representatives met with several representatives of the Internal Revenue Service (IRS), in Little Rock, Arkansas.The JLM representatives discussed with the IRS the possibility of obtaining investment tax credits on religious master video recordings ("MVR" or "tapes"). Specific details of JLM's plan were not discussed and no tapes were shown to the IRS.The meeting lasted about 20 minutes. The JLM representatives left the meeting with the belief that their proposal qualified for an investment tax credit. The IRS however refused to give the JLM representatives written approval of their plan. Gary testified that a verbal legal opinion approving JLM's plan was later obtained from C. P. Christian (Christian), an attorney from Jacksonville, Florida, who specialized in criminal law. JLM then developed a tax shelter plan similar to the one described to them by Williams but utilizing MVR. JLM wanted to make Christian programming available to low power television stations for family entertainment and education. To prepare for this endeavor, JLM members read articles and magazines but felt that their investment was in a "pioneering, virgin field. *261 " Prior to this time, JLM had never been involved in the production of MVR. On November 5, 1980, a special meeting of the JLM Board of Directors was called to approve the video program which JLM called "The Video Ministry." JLM set a goal of producing 30 tapes in 1980. Thompson was to be hired as one of the artists to make the tapes. For his services, Thompson was to receive royalties of 20 percent of the selling price of each tape. The royalties were to be paid [5] at the rate of 10 percent of the income received from the sale of the tapes up to a maximum of $50,000 per year. JLM then sold the tapes to DanKryst, an organization established by Gary Chester to sell the tapes to individual investors. Names of potential investors were obtained from JLM's mailing list. Parkin Printing Co. was first approached to market the tapes. After Parkin Printing Co. declined, Ron Davis, who worked for Parkin Printing Co., was recommended to market the tapes. Davis formed SWEET, Inc. (SWEET), to market the tapes. The tapes were produced sometime subsequent to October 1980. [6] One of JLM's employees, Dave Keylor (Keylor), operated the video equipment used to make the tapes. *262 Formation of DanKryst, Inc.
Gary was a high school graduate with one year of college courses. While in college he took two accounting courses. During the time he was associated with JLM, he was working as a tax return preparer in Hardy, Arkansas. Prior to that time he had worked as a bookkeeper for Plough Corp., an industrial corporation, reconciling corporate bank accounts. He also worked at one time for an accounting firm. DanKryst was an Arizona corporation incorporated under the name Don Lyon, Inc. on September 22, 1980.Gary purchased the corporate shell of Don Lyon, Inc. from Williams. On July 13, 1981, an "Amendment to the Articles of Incorporation" was filed with the State of Arizona changing the name of Don Lyon, Inc. to DanKryst, Inc. [7] A "Statement of Foreign Corporation Seeking Authorization to do Business in Arkansas" was filed with the Secretary of the State of Arkansas on June 15, 1982. Gary was listed as the corporate president and resident agent. Gary held 51 percent of the DanKryst stock while his wife held the other 49 percent. Gary and his wife were the only members of DanKryst's Board of Directors but they did not hold any meetings. *263 During the fall of 1980, DanKryst (or Lyon), entered into agreements with JLM for the purchase of 30 tapes. [8] Each tape was purchased for $95,000. None of these tapes were copyrighted. The purchase price of $95,000 was suggested by Williams; Gary did not attempt to negotiate with JLM concerning the price. The agreements called for each downpayments of $5,000 and a $90,000 note at 7.5 percent annual interest for each tape. DanKryst paid JLM a $100 downpayment for each tape with the remainder of the downpayment due within one year of execution of the note. Gary signed the notes for DanKryst. When the notes were signed DanKryst had no assets except for a minimal amount of cash. The total purchase price for the 30 tapes was $2,850,000. Prior to purchasing the tapes from JLM, Gary did not contact anyone involved in the production, or marketing of religious video tapes to determine the costs to produce such tapes, or whether there was a market for the tapes. Neither did he seek an appraisal with respect to the tapes. In December of 1980, DanKryst began *264 selling the tapes to investors. The price for each tape was $100,000. Prospective investors learned about the tapes through Thompson who discussed the tapes at JLM's tent crusades, or through Gary, Daniel, or Everett Croslow, who acted as sales representatives for DanKryst. Prospective investors were shown a copy of section 38, [9] and were advised that the tapes qualified for investment tax credits. They were also asked to make their tax returns for the three prior years available so that the amount of investment tax credit they could earn, and utilize, by investing in a tape could be computed. Using these prior tax returns, the total amount of Federal income taxes paid and recoverable through use of the investment credit and carrybacks was calculated for each potential investor. This amount was determined to be the investor's 10 percent cash downpayment, which was then multiplied by 10 to determine the total amount of the investor's investment in the tapes. If the investment was to be less than $100,000, the investor was sold a percentage of one tape. If it was more than $100,000, the investor was sold one tape and a percentage interest in an additional tape.None of the investors *265 was asked to present a financial statement. Davis was present at meetings with prospective investors and discussed with them his strategy for marketing the tapes which included pooling all the income from exploiting all the tapes so that all investors would share in the income from the tapes based upon their respective percentages of ownership. None of the investors attempted to negotiate the purchase price for their tapes, or their repayment schedules. To purchase a tape, each investor had to complete a "General Installment Sale and Security Agreement" (the "agreement"), and a "Full Recourse Promissory Note (the "note"). Forms for these documents were given to Gary by Williams. The purchase price in each agreement was $100,000 per tape. The payments under each agreement consisted of a cash downpayment of from $10 to $100, [10] the balance of the downpayment due on receipt of the investor's tax refunds due to investment tax credit carrybacks from the three prior years, and a final payment as set out in the note incorporated by reference. The *266 agreement required that each debtor maintain insurance on his or her tape. Testimony by several representative investors indicated that none of the investors obtained such insurance. Each investor was to indicate whether his or her collateral (i.e., tape), was to be used for personal or business purposes, and where the collateral was kept. None of this information was supplied by any of the investors. Each note was signed only by the investors and recited that it was "made and delivered in accordance with that purchase agreement of even date thereof, the terms of which are by this reference incorporated herein." The investor's debt obligation was secured by a security interest in the tape. After a note was signed, following Williams' advice, Gary returned it to the maker with the understanding that if the notes were needed by DanKryst the makers were to return them to DanKryst. When the IRS began its investigation of the MVR investment program, Gary asked the investors to return the notes to DanKryst, or to execute a new note if the note had been misplaced. *267 If the investors failed to repay the notes Gary testified that he had three options including: 1) refinancing the notes; 2) respossessing the collateral; or 3) suing for collection on the note. Because of his personal relationship with the investors, the only option Gary ever exercised was to repossess tapes from several investors who wanted to be released from their investment when a split occurred within JLM. Formation of SWEET, Inc.
Davis graduated from high school in California and shortly thereafter began managing a furniture store.In 1975, after working in a management capacity in several difference businesses, he moved to Arkansas and worked as a division manager for Capitol Business Machines, investigating the market for copy machines. At the time JLM was developing its tax shelter plan, Davis was employed as director of marketing in charge of sales for the equipment division of Parkin Printing Co., an office equipment firm. Davis was also a member of National Office Machine Dealers Association (NOMDA). As a member of NOMDA, Davis often spoke at seminars discussing how to organize or run a business. On March 3, 1981, Davis formed a corporation named SWEET (Spiritual *268 Wealth Everyone's Entitled To). [11] Davis is the only officer of SWEET and owns 30 of its 1,000 shares of stock. When Parkin Printing Co. decided not to market the video tapes produced by JLM Davis formed SWEET to do so because he felt obligated to the investors to market their tapes and he also believed that the market for Christian video tapes held great promise due to the expansion of low power television and the growing video market. To market the tapes, Davis established the SWEET Library of Tapes (the "library"). The library made tapes available for sale or rental to those individuals who were members of the library. Davis sold charter memberships in the library for $250. Student memberships were available or $65. No list was maintained of the memberships sold, or of individuals who rented or purchased the tapes, or how much income was received from each tape. Records were maintained as to the total income from the tapes and equipment which amounted to $7,468.51 total for 1981, 1982, and 1983, of which $2,624.43 came from individuals outside the investment program. Davis also utilized direct mailings of a list of the tapes available as a marketing tool. Davis kept the *269 tapes in his possession. He did not insure the tapes but instead made a copy of the tapes and stored them in his attic in a foot locker. Davis did not take any of the tapes to an appraiser to ascertain their quality. Nor did he show the tapes to any television stations to determine whether the stations would broadcast the tapes. He was not concerned with the quality of the tapes due to the market he was after. The first agreements signed by investors using SWEET as a marketing agent were not signed until the spring of 1981. These original agreements titled "Video Systems Marketing Contract" referred to each investor as the lessor and to SWEET as the agent. The agreement provided that the investor was to pay SWEET $295 [12] as an origination fee and lease his tape to SWEET for seven years. SWEET was to market the tape for seven years holding all the proceeds from the tape in trust for the investor.The proceeds were to be placed in a pool and divided among *270 the investors according to their respective percentages of ownership. Fifty percent of the pool's proceeds were to go to DanKryst as payment on the investors' accounts with DanKryst, and the remainder was to be retained by SWEET as consideration for its services. Each investor also had to sign an "editing format" detailing what was to be done to his or her tape. The original sales agreements were modified in 1983 and 1984 when SWEET sent new marketing contracts to the investors. The form of the contracts was changed because of questions raised by the IRS and some of the investors concerning the contract's reference to each investor as "lessor." The new contracts were each entitled "Master Video Recording Marketing Contract." These contracts, executed in 1983 and 1984, were backdated to 1980 and 1981, respectively. These contracts provided for a term of five rather than seven years; referred to each investor as "producer" instead of as "lessor"; provided that funds received by SWEET for editing the tapes were included in the pool to be divided amongst the investors; increased SWEET's marketing fee to $1,500 for a $100,000 *271 tape; and provided that the contracts could be renewed at SWEET's option rather than at the investors. No additional marketing fees were paid to SWEET after the execution of these new contracts. Davis stated that the tapes made in 1980 had to be copied shortly thereafter because they were originally taped in a "Beta I" format which became outdated. SWEET also agreed to edit the tapes in return for payment by JLM of an editing fee. [13] The editing fee was $250 per hour which resulted in a fee of $24,000 per tape. JLM paid the editing fees without questioning what was done to each tape. Davis stated that it took 90-120 hours to edit each tape.SWEET kept a certain percentage of the editing fees and placed the rest in the income pool to be distributed to the investors.He said SWEET purchased most of the equipment it utilized in editing the tapes. Davis testified that he had spent about $300,000-400,000 on this equipment. Sometime in 1982 or 1983, JLM prepared "Production Costs Summary Reports" for each tape sole in 1980. All of these reports were essentially identical and listed the following charges: *272 Film Costs
$40.69
Copy Costs/Prep. Material
100.00
Studio Costs - Rent/Use
400.00
Star/Actor Compensation
19,000.00
Filming Crew Wages
200.00
Travel/Food/Lodging/Etc.
10.36
Editing Costs
24,000.00
Miscellaneous - G&A
600.00
In 1981 SWEET's books reflected income of $146,452.79 from the video program, of which $144,000 was received from JLM as editing fees. The library did not prove very successful; income from library memberships and rentals amounted to only $2,452.79. Of this amount, $517.86, was received from DanKryst. In 1982 SWEET received $2,491 for rentals of video equipment and tapes, of which $1,889.41 was received from individuals involved in the promotion of the video program. In 1983, SWEET received $2,524.74 for rentals of video tapes and equipment. All of this money was received from individuals involved in the promotion of the video program. [14]
Several of the petitioners testified on behalf of petitioners at the trial, including Ledford, Guzman, Strader and *273 Daniel Chester. From their testimony we make the following objective findings of fact. The investors for the most part lived in the state of Arkansas. A few of them held college degrees, such as Ledford (vocational education), and Guzman (nursing), but others, such as Chester and Strader had received no formal education beyond the high school level. Some of them had held responsible managerial type jobs and had accumulated property, such as Chester ($600,000), and Ledford ($200,000), while others had very little net worth at the time they signed the notes, such as Guzman, who signed a note for $140,000 when she had a net worth of $21,000, and Strader, who signed a note for $30,000 when he had a net worth of $10,000. None of them had any experience in producing or marketing video tapes or knew how much a tape might rent for. Very few of them made any investigation or inquiry about the possibility or probability of making a profit in such a venture. Very few of them ever viewed the tapes they obstensibly purchased or even knew where the tapes were. They did not negotiate the terms of the transactions and had little or nothing to do with the tapes after they were acquired, except *274 entering into marketing agreements with SWEET. Some of the investors hoped that they might make a profit from participating in the program, but they had no facts or figures upon which to base such a hope.They were relying on the possibility that low power television stations could cause the video business to prosper, but this did not materialize. Many of the investors were followers of Charles Thompson and wanted to help his evangalistic program. All of them were aware of the tax benefits they thought were available through participation in the program, and this was their predominent motive in participating. While all of them would have welcomed a profit from the activity, making a profit was not their primary objective in entering the program.None of them reported a profit on their investments after deducting depreciation and interest. Respondent offered the testimony of a well qualified expert witness, Gloria R. Mosesson, on the value of the tapes. She had considerable experience in the literary and publishing fields, including technical editing, selecting and editing books for publication, negotiating contracts for subsidiary rights, producing records, audio cassettes and *275 audio/visual materials, and evaluating the costs involved in producing an item.Mosesson prepared an appraisal of the tapes produced by JLM. She viewed each of the tapes to evaluate their content, quality and cost basis. She spoke with various individuals in the technical field of audio/visual production, but she has never produced a video tape herself. She also examined the contracts, promissory notes, agreements, and promotional materials used by SWEET and JLM. In making her appraisals she used techniques established by the American Association of Appraisers. She based her evaluation of the costs to produce the tapes upon her own knowledge. However, she did not receive or incorporate in her appraisals any figures concerning income earned per tape or sales per tape because it was not available to her. In Mosesson's opinion, the tapes had a zero value. Petitioners offered the testimony of Tom Ferstel concerning the value of the tapes. While Ferstel was well qualified as an appraiser, most of his experience in appraising had been in the field of real estate. Ferstel testified that he did not feel qualified to appraise an MVR but that the techniques used should be the same. *276 He was critical of the methods and information relied on by Mosesson. Ferstel did not give an opinion of the value of the tapes and petitioners offered no expert evidence on that subject. IRS Investigation
In June 1983, Charles Schnebelen (Schnebelen), an examining agent in the Exempt Organization Branch, was assigned to audit the SWEET corporate tax returns, and the individual return of Gary Chester. As a result of his investigation, the Abusive Tax Shelter Committee of the IRS determined that a further examination was warranted to determine whether the program was an abusive tax shelter pursuant to sections 6700 and 7408. Schnebelen was then also assigned the returns of Davis, DanKryst, and First Peter. Cyndrea was also under investigation at this time. As a part of his investigation, Schnebelen sent a notification letter to each of the individuals involved informing them of the investigation and seeking to set up a meeting. After examining records obtained, either through summons proceedings or voluntarily made available, Schnebelen found evidence of an elaborate money circle involving SWEET, DanKryst, First Peter, Cyndrea, and JLM. Other than the relatively small *277 amounts earned from tape or equipment rentals the only money received by these entities from outside sources were the downpayments received from petitioners. Funds were transferred [15] from one organization to another until a complete circuit had been made. [1]6 Each transfer resulted in a credit of income to the investors' accounts. DanKryst received downpayments from the investors when they received their tax refunds due to investment tax credit carrybacks. DanKryst made payments to JLM on the notes it issued to JLM. JLM then paid SWEET editing fees. SWEET then paid DanKryst services costs. [1]7 During 1982, DanKryst, First Peter, and Cyndrea, transferred funds totalling $1,353,999.76 to JLM. JLM transferred funds totalling $1,287,648.68 to SWEET. SWEET put 10 percent of the funds in its general operating account and then transferred $1,189,021.48 to DanKryst, Cyndrea, and First Peter. Schnebelen's investigation resulted in notices of deficiency being sent to petitioners disallowing their deductions and credits taken in connection with the purchase of an MVR from DanKryst. *278 OPINION The first issue for our decision is whether petitioners are entitled to deductions for depreciation and interest and an investment tax credit for the year 1980 as a result of their investments in the video tapes. [18]
Petitioners contend that their purchases of the tapes were with the objective of making a profit and therefore their investments are deductible under sections 162, 212, 163, 167 and 183. They liken their activity to that of an investment in an oil well where "higher expenditures are necessary with a very low expectation of profit." Respondent on the other hand contends that the video rpogram invested in by petitioners was a sham, totally lacking economic substance, and that petitioners did not have a bona fide objective of making a profit, and therefore are not entitled to their claimed deductions, losses and credits. Respondent further contends that the deductions and credits are not allowable because the promissory notes signed by *279 petitioners were in fact non-recourse notes, and petitioners were not "at risk" for the face value of the notes or the interest thereon. Respondent also contends that the tapes were not in existence in 1980 and thus would not support a deduction for depreciation or an investment credit for 1980. For these and other reasons respondent concludes that his determinatiob should be sustained. We agree with most of respondent's arguments but need not take the time to discuss all of them. A summary analysis of the JLM program illustrates why. JLM was supposedly the producer of the tapes, although there is no evidence that anyone in the organization had had any experience in the recording business. The purported cost of producing a tape was less than $50,000, $24,000 of which was paid to SWEET for "editing" the tapes and $19,000 of which was paid as compensation to the "star/actor" who made the recording. Small amounts were paid for other costs of production. JLM sold the tapes to DanKryst for $95,000 each, payable $100 or less in cash at the time of the sale, the balance of a $5,000 cash downpayment due within one year, and the balance of the cost represented by a $90,000 note. *280 DanKryst then sold the tapes to petitioners-investors for $100,000 per tape, payable $100 or less in cash at the time of sale, the balance of the approximately 10 percent downpayment due when the investor received a refund of his taxes, and the balance of the purchase price was represented by a "Full Recourse" promissory note due in seven years. While the note was designated "Full Recourse" nothing was said as to the meaning of those words. The agreement attached to the note mentioned only the obligor's interest in a tape or tapes as the security for the note. Petitioners' investments were determined by the total tax savings and refunds that could be realized by each investor by claming an investment credit for the year 1980 of 10 percent of his investment and carrying back any unused portion thereof to claim a refund of taxes paid for the years 1977, 1978 and 1979. If the investors' recoverable amount was $10,000, his investment was $100,000 for one tape; if it was only $7,000 his investment was $70,000 for a 70 percent interest in one tape. Petitioners-investors then entered into agreements with SWEET to market the tapes for $295 each. SWEET was to pool all of the income *281 from leasing the tapes in trust and pay 50 percent thereof to DanKryst to be applied on petitioners' obligations to DanKryst, with the remaining 50 percent being retained by SWEET as compensation for "services." [19] We have no explanation of the terms of these agreements with the customers or how much rental would be charged for use of a tape. The evidence does indicate that the total income from the tapes and equipment totalled $7,468.51 for 1981, 1982 and 1983, of which only $2,624.43 came from individuals outside the investment program. Apparently no one connected with the program was called upon to put up any cash except for the small cash downpayments made by petitioners-investors at the time they bought the tapes and the cash received by petitioners on their claims for refund based on the carrybacks of the losses and credits related to their claimed investments in this program in 1980. This cash was then circulated amongst the participants to give the appearance of activity in *282 the various accounts. When petitioners received their refunds, the cash was turned over to DanKryst to apply on to their accounts (about 10 percent of the total account). DanKryst retained a small amount of the cash and turned the balance over to JLM to apply on DanKryst's indebtedness to JLM.JLM in turn paid over a part of this cash to SWEET as compensation for editing the tapes and for services, [20] and presumably paid some of it to the people who recorded the tapes. While petitioners' accounts were credited from time to time with payments of interest and principal, they received no actual cash that they used to pay this indebtedness. As will be discussed, supra, the tapes themselves were of very little value, certainly nowhere near the paice tag of $100,000 which was used as a basis for the program. While it might be possible for investors to make a profit out of an activity such as this if the tapes were professionally produced and marketed using subjects and actors that would attract the attention of the general public, it was not realistic to believe that these investors could make a profit out of *283 this activity. The 30 tapes involved here would undoubtedly saturate the limited market for which they were designed and all indications are that they were not well made. To expect their tapes to produce $3,000,000 in revenue over and above the interest that was supposedly accruing on the notes, and other costs, in a period of seven years would have been wishful thinking. This program appears to have been a carefully designed "no lose" venture for all the participants except the United States Government. JLM apparently received a large amount of the cash that was generated by the refunds, and also received some publicity for its evangalistic program. DanKryst presumably received and retained a part of the refunds and had little or no expense. SWEET also received and retained a good share of the refunds and some of the income produced by the tapes for editing, services and commissions, without much expense. Noen of them had anything to lose and we surmise that if the program broke down all of them would just walk away from it without trying to collect any of the receivables owed them on paper. Many of the investors had insufficient income or assets, aside from that produced *284 by the tapes, to pay the notes. Furthermore, there is no evidence that anyone has tried to collect either principal or interest on the notes up to the time of trial. Perhaps Uncle Sam's largesse has been sufficient to mollify the creditors to date -- or perhaps they never expected to be paid in full. Based on the above scenario, we must conclude that there was no economic substance to the transactions upon which petitioners rely to support their claimed deductions and credits. The notes petitioners gave to DanKryst were not actually recourse notes and did not represent true indebtedness. The face values of the notes were far in excess of the value of the tapes designated as security for payment of the notes and did not represent payment for or an investment in the tapes. Nor did they represent obligations upon which interest would accrue. The above conclusion might be enough to bring our inquiry to a close with a decision for respondent. See Knetsch v. United States,364 U.S. 367 (1960); Moore v. Commissioner,85 T.C. 72 (1985); Brannen v. Commissioner,78 T.C. 471, (1982) affd, 722 F.2d 695 (11th Cir. 1984); *285 Grodt & McKay Realty Co. v. Commissioner,77 T.C. 221 (1981). However, we believe it would be more judicious to consider some of respondent's other arguments in support of his position. Respondent also contends that petitioners did not have bona fide objectives of making a profit, and therefore are not entitled to their claimed losses and deductions under sections 162 or 212. In order to constitute a trade or business for purposes of section 162(a) or an activity engaged in for the production of income under section 212, an activity must be carried on in good faith with the actual and honest objective of making a profit. Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Fuchs v. Commissioner,83 T.C. 79, 97-98 (1984); Dean v. Commissioner,83 T.C. 56, 73-74 (1984); Allen v. Commissioner,72 T.C. 28, 33, (1979). The issue of whether a taxpayer *286 possesses the requisite profit motive is one of fact to be resolved on the basis of all the evidence in the case. Sutton v. Commissioner,84 T.C. 210, 221 (1985); Surloff v. Commisioner,81 T.C. 210 (1983); Fox v. Commissioner,80 T.C. 972, 1007 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984). In making this determination, more weight must be given to the objective facts than to the taxpayer's mere after-the-fact statements of intent. Thomas v. Commissioner,84 T.C. 1244, 1269 (1985); Engdahl v. Commissioner,72 T.C. 659 (1979). Petitioners bear the burden of proving that they possessed the requisite profit motive. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). In addition, since no partnership is involved, the intent of each petitioner is determinative. Section 183 provides generally that, except as otherwise provided for in that section, individual taxpayers will not be allowed a deduction for activities that are "not engaged in for *287 profit." An activity "not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Section 1.183-2(b), Income Tax Regs., provides several criteria for assisting in making such a determination, including the following: (1) Manner in which the taxpayer carries on the activity; (2) The expertise of the taxpayer or his advisors; (3) The time and effort expended by the taxpayer in carrying on the activity; (4) Expectation that assets used in activity may appreciate in value; (5) The success of the taxpayer in carrying on other similar or dissimilar activities; (6) The taxpayer's history of income or losses with respect to the activity; (7) The amount of occasional profits, if any, which are earned; (8) The financial status of the taxpayer; and (9) Elements of personal pleasure or recreation in the activity. Initially, we must state that we are impressed with petitioners' sincerity concerning *288 their religious beliefs and their desire to help JLM. Most of them lived in Arkansas. They were not wealthy people with high incomes. Many of them were followers of Charles Thompson. Some of them had had experience in business but none similar to the marketing of MVR. However, the fact that petitioners were motivated in part by a desire to help JLM "spread the gospel" does not satisfy the requirement that petitioners had a profit motive. The evidence indicates that most of petitioners were interested in assisting Thompson's evangalistic program, that they were aware of and interested in the current tax savings that would be available through participation in the program, and that they gave little or no thought to how or whether they could make an economic profit by participating. While all of petitioners testified that they intended to make a profit, the objective facts indicate otherwise. Testimony by the representative petitioners Chester, Strader, Ledford, and Guzman, indicated that none of petitioners conducted their purchase of the tapes in a businesslike manner, nor were they concerned with considerations that typically affect a sincere investor. See, e.g., Flowers v. Commissioner,80 T.C. 914, 933 (1983). *289 None of petitioners even viewed their recordings before they purchased them. None of them sought an independent appraisal of the tapes. They did not attempt to ascertain whether there was a market for the tapes. They did not seek investment advice concerning their purchase other than to discuss their purchases with the JLM representatives who admittedly had an interest in persuading petitioners to purchase the tapes. All of petitioners were essentially passive investors. None of petitioners attempted to negotiate their contract or its terms, or to question whether they were paying a fair price for the tapes. Several of petitioners had been trained in the use of audio/visual materials but none of them had any experience in the production or marketing of MVR. None of petitioners investigated the backgrounds of Davis, Gary, or any of the other JLM representatives. To our knowledge, none of petitioners kept formal books or records with respect to their investments. None of them were aware of how many times their tapes would have to be rented or sold for them to make a profit, and at the trial of this case, none of them knew whether their tapes had actually been rented or sold. The *290 tapes, supposedly worth $100,000, were not even insured. It is apparent from our reading of the record, that petitioners' activities relative to the tapes had none of the "trappings of a business." Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). None of petitioners reported a profit from their investment and due to the deductions and credits taken in connection with their investment, petitioners reported far less tax liability than they otherwise would have reported. Indeed they all incurred losses as a result of their investments. [21] In addition, none of petitioners questioned SWEET as to what it was doing to market the tapes. While evidence was presented that SWEET sent out periodic newsletters, none of these newsletters discussed specific details of SWEET's marketing of the tapes. We recognize that since the production and marketing of the tapes was a relatively new field it would be difficult to find persons with a great deal of expertise in this area. However, by the same token, since *291 the field was relatively new, one would have expected petitioners to have exhibited more caution when making such substantial investments. Indeed, Guzman signed a $130,000 promissory note when her net worth was $21,000 and her annual gross income was about $20,000. Accordingly, while we believe that petitioners sincerely hoped to spread the gospel and to further the beliefs of JLM through the marketing of the tapes, we find that did not possess the actual and honest profit motive required under section 162, or section 212. In fact we do not believe any of petitioners were really concerned about making a profit. They were concerned about obtaining cash tax refunds to support their the ministry or their own personal interests. As a result of our finding that petitioners lacked an actual and honest profit motive, under section 183 all deductions taken in connection with petitioners' investment in the tapes are disallowed except to the extent that gross income exceeds the deductions allowable. Section 183(a) and (b). We will examine each of these deductions separately. At the trial of this case we heard evidence from respondent's witness, Mosesson, that the tapes had zero value. *292 DanKryst set the purchase price for each of the tapes at $100,000. This figure included DanKryst's purchase price of $95,000 plus a $5,000 overhead charge. Petitioners presented no evidence as to the value of the tapes other than their "Production Costs Summary Reports" which we find to be of little value. [22] They sought no appraisals of the tapes and they did not negotiate the $100,000 purchase price per tape.They presented no expert testimony as to the value of the tapes. Petitioners did however present evidence that from 1981 to 1983 only $2,624.43 was earned by SWEET from the sale and rental of the tapes to individuals not involved in the promotion of the investment program. Upon viewing the tapes one quickly realizes that it is unrealistic to value them at $100,000. The tapes are of "amateurish" quality. The vocal quality is often shallow and the movement from scene to scene is very disruptive. The artists featured are not well-known persons, e.g., Thompson, *293 and would have limited appeal.Each tape begins with a listing of credits including the producers or purchasers of the tape, and the title of the tape. Then the artist begins to discuss the featured topic using various visual aides.The tapes are of a fundamental religious nature as evidenced by one scene where Thompson while speaking asks his listeners to "shout Amen." While the tapes do have some appeal as indicated by the $2,624.43 earned from 1981 to 1983, we think this appeal is somewhat limited due to the quality and content of the tapes, and the artists involved. [23] We therefore find that the tapes have de minimis value. In addition to his argument that the tapes have zero value, respondent argues that the notes executed by petitioners, which on their face *294 appeared to be full recourse promissory notes, were in reality nonrecourse notes. We agree. We are not convinced that any of the parties expected the notes to be paid in full or that any action would have been taken to collect on the notes if they were not paid in full. We are influenced in reaching our decision by the actions of the parties in regard to the "recourse notes." When petitioners purchased their tapes they kept the promissory notes. Gary let petitioners keep the notes because he had been so advised by Williams. Of course this would prevent the notes from falling into the hands of third parties who might have tried to collect on them. When the IRS began investigating the video program, Gary asked petitioners to give him the notes. He realized at that point the significance in allowing petitioners to retain the notes. Without possession of a note, a person claiming ownership is not a "holder" and has none of the rights of a holder. Haupt v. Coldwell,500 S.W. 2d 563 (Tex. Civ. App. 1973). Without the face value of the notes, the basis for all the tax deductions would fall. As further evidence that the notes were nonrecourse in nature, the purportedly *295 recourse nature of the notes was not honored by the parties. When questioned as to what recourse he had if the investors failed to repay the notes, Gary replied that he could: 1) repossess the tapes; 2) sue to collect on the notes, or 3) refinance the notes. However, the only option he had ever exercised was to repossess tapes from several investors who wanted to be released from their agreement when a split within JLM occurred. He had made no attempt to enforce any of the notes and would personally have difficulty doing that due to his relationship with the investors. Accordingly, based upon the above factors, we find that petitioners had no personal liability [24] for the notes. In substance, as revealed by the parties' actions, the notes were in reality nonrecourse notes. Moreover, the excessive debt evidenced by the notes and the excessive price charged for the tapes compared with the actual value of the tapes demonstrated clearly that the notes lacked economic substance. The notes therefore do not represent genuine indebtedness. See, e.g., Hagler v. Commissioner,86 T.C. 598 (1986); Fuchs v. Commissioner,83 T.C. 79, 102 (1984); Brannen v. Commissioner,78 T.C. 471, 493 (1982), *296 affd. 722 F.2d 695 (11th Cir. 1984). Interest deductions
Section 163(a) allows a deduction for all interest paid or accrued within the taxable year on indebtedness. We have held that the notes herein do not constitute genuine indebtedness because they lack economic substance. Therefore, the requirement of section 163 that interest must be paid or accrued on indebtedness is not met.See Knetsch v. United States,364 U.S. 361 (1960); Narver v. Commissioner,75 T.C. 53 (1980), affd. per curiam 670 F.2d 855 (1982); Flowers v. Commissioner,supra at 942. *297 Accordingly, petitioners' deductions for interest are disallowed. Depreciation deductions
Section 167 allows as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear of property used in a trade or business, or held for the production of income. Section 183(b) provides that if an activity is not engaged in for profit there shall be allowed: (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). In order to qualify for a deduction, the depreciation expenses must be associated with an "actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642. *298 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Dean v. Commissioner,83 T.C. 56 (1984); Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981). In addition, pursuant to section 183(b)(2), depreciation deductions are only allowed to the extent of the gross income from the investment activity. Section 1.183-1(b)(1)(iii), Income Tax Regs.
We have held that petitioners lacked an actual and honest objective of making a profit. Moreover, petitioners reported only losses from their investment in the tapes. We therefore hold that under section 183(b) no depreciation deductions are allowable.See Elliott v. Commissioner,84 T.C. 227, 243 (1985), affd. 782 F.2d 1027 (3d Cir. 1986). [25]
*299 Investment tax credits
Petitioners claimed investment tax credits for the tapes pursuant to section 38. Section 38(a) provides for an investment tax credit with respect to "section 38 property," defined in section 48(a)(1) as follows: (a) Section 38 property. -- (1) In general. -- Except as provided in this subsection, the term "section 38 property" means -- (A) tangible personal property * * *. Such term includes only recovery property * * * with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years or more. * * * Depreciation is allowable with respect to property used in a trade or business or held for the production of income. Section 167(a). We have disallowed petitioners' deductions for depreciation because they lacked an actual and honest objective of making a profit. Accordingly, pursuant to section 48(a)(1) we must disallow the investment tax credits claimed as well. [26]
*300 Charitable contribution
Respondent disallowed petitioner Guzman's charitable contribution deduction of $2,707.80. Petitioner bears the burden of proof in regard to this deduction. Welch v. Helvering, 290 U,S. 111, 115 (1933); Rule 142(a). Guzman has offered no evidence to substantiate this deduction. We therefore find that petitioner has failed to carry her burden of proof. Accordingly, we sustain respondent's determination. Additions to Tax
Respondent determined additions to tax against petitioners pursuant to section 6659(a), section 6621(d), and section 6653(a). Section 6659(a) provides for an addition to tax of up to 30 percent of the underpayment where there is a valuation overstatement of the value of property, or of its adjusted basis, of 150 percent or more. Section 6659(c). Petitioners' argument is simple. They state merely that they have not made any valuation overstatements. Respondent disagrees and we agree with respondent. Petitioners have offered *301 no evidence of the value of the tapes other than their self-serving assertions. No expert testimony was offered. No objective appraisals were entered into evidence. We have found that the value of the tapes was de minimis and that the promissory notes executed by petitioners did not represent genuine indebtedness. We have also held that petitioners' bases in the tapes was limited to their nominal cash payments of $10 to $100. Since petitioners included the promissory notes in their computations of basis they overvalued their basis by an amount in excess of 250 percent. Accordingly, respondent's determination of an addition to tax under section 6659(a) is sustained. Section 6621(d) provides for the payment of interest on substantial underpayments attributable to tax motivated transactions. Section 6621(d) was enacted, among other reasons, "to put more teeth into section 6659." Neely v. Commissioner,85 T.C. 934, 957 (1985). The legislative history of section 6621(d) indicates Congress' intent to stifle tax shelter promotions that exploit the deductibility of appreciation *302 in capital gain assets. H. Rept. No. 98-861 (Conf. Rept.), 1984-3 C.B. (Vol. 2) 1, 252. The amount of interest payable under section 6621(d) is 120 percent of the amount established under section 6621(b), and is applicable with respect to interest accruing after December 31, 1984, even though the transaction was entered into prior to the date of the enactment of section 6621(d). Solowiejczyk v. Commissioner,85 T.C. 552 (1985). A substantial underpayment is defined as "any underpayment of taxes * * * which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $1,000." A tax motivated transaction includes any valuation overstatement under section 6659(c). Section 6621(d)(3)(A)(i); See, e.g., Snyder v. Commissioner,86 T.C. 567 (1986); Parker v. Commissioner,86 T.C. 547 (1986). We have held that petitioners are liable under section 6659(a) for valuation overstatements. We therefore find that petitioners' substantial underpayments were due to tax motivated transactions. Accordingly, respondent's determination of an addition to tax under section *303 6621(d) is sustained. Section 6653(a) provides for an addition to tax of five percent of the underpayment if any part of the underpayment is due to negligence or intentional disregard of rules and regulations. For purposes of section 6653(a), negligence has been described as a "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Marcello v. Commissioner,380 F.2d 499, 506 (5th Cir. 1967). Petitioners have the burden of proof on this issue. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972); Enoch v. Commissioner,57 T.C. 781, 802-803 (1972). Petitioners contend that JLM representatives sought advice from the IRS concerning the tax treatment of MVR. The JLM representatives met with individuals from the IRS and left this meeting with the belief that their MVR qualified for investment tax credits. They did not however present specific details of their tax shelter plan and the IRS refused to give them written approval of the plan. Petitioners relied on the advice of the *304 JLM representatives that the MVR qualified for the credits and deductions taken. However, petitioners did not seek advice from individuals independent of JLM. Petitioners expressed trust in Davis, Chester, and other JLM representatives. None of them ever viewed their tapes, or sought an independent appraisal to determine whether they were actually worth $100,000. Petitioners' actions in purchasing the tapes are not what one would expect from a reasonable and ordinarily prudent person. We therefore find that petitioners have failed to overcome respondent's determination of an addition to tax under section 6653(a). To reflect the foregoing, Decisions will be entered for respondent.
APPENDIX A Docket
Tax
Additions to Tax
Residence When
Nos.
Years
Deficiency
§ 6653(a)
§ 6659
Petition Filed
Robert L. & Leona M. Chester: 14299-84
1977
$5,007.38
Zephyrhills,
1978
1,919.11
Florida
1979
5,502.50
1980
1,493.00
1981
4,962.00
$1,488.60
1982
7,430.00
2,229.00
Nolen E. & Nadine C. Sherritze: 14324-84
1977
$2,221.00
Tampa,
1978
5,224.00
Florida
1979
3,219.00
1980
151.00
1981
2,149.00
[1] 644.70
1982
[2] 2,503.00
[3] 750.90
Doris M. Guzman: 14325-84
1977
$5,052.95
Winnsboro,
1978
5,857.04
Louisiana
1979
3,090.01
1980
2,456.00
Billy J. & Thelma Ledford: 14328-84
1977
$5,120.00
Millington,
1978
1,921.00
Tennessee
1979
5,959.00
1980
6,401.50
Donald E. & Virginia M. Kifer: 14329-84
1977
$3,759.00
Belleville,
1978
3,123.00
Illinois
1979
4,344.00
1980
10,039.00
William D. & Dawn R. Moore: 15227-84
1979
$1,038.00
$ 51.90
North Little Rock,
1980
3,051.00
152.55
Arkansas
Theresa G. DeGraaf: 15228-84
1977
$1,084.00
$ 54.00
Hardy,
1978
416.00
21.00
Arkansas
1980
517.00
26.00
Daniel R. & Martha L. Chester: 15240-84
1977
$4,354.92
Cherokee Village,
1978
500.88
Arkansas
1979
4,101.20
1980
1,040.00
Gene R. & Dorothy J. Vaughn: 15915-84
1979
$ 233.93
$ 11.70
Hardy,
1980
923.00
46.15
Arkansas
James W. & Charlotte Strader: 15916-84
1980
$ 330.00
$ 17.00
Hardy,
Arkansas
Carl A. & Rochelle A. Culpepper: 15932-84
1978
$ 325.00
$ 16.25
North Little Rock,
1979
1,482.00
74.10
Arkansas
1980
1,157.00
57.85
Grider & Sally Thrasher: 15933-84
1977
$1,080.00
Broken Arrow,
1978
2,051.00
Oklahoma
1979
469.00
1980
887.00
Joe D. & Carol L. Kuykendall: 20675-84
1977
$4,419.00
$220.95
Sherwood,
1978
3,826.00
191.30
Arkansas
1979
4,347.00
217.35
1980
5,041.00
252.05
Billy O. & Dianne Urfer: 22153-84
1978
$ 725.00
Heber Springs,
1979
761.00
Arkansas
1980
270.00
Renita L. Johnston: 22336-84
1977
$ 512.00
$ 26.00
Lincoln,
1978
597.00
30.00
Nebraska
1979
801.00
40.00
1980
953.00
48.00
*305 APPENDIX B FULL RECOURSE
PROMISSORY NOTE
$ FOR VALUE RECEIVED this     day of      , 19  ,      , (Maker), promises to pay to the order of      , (Payee), the principal sum of       DOLLARS ($    ), with interest at the rate of eight percent (8%) per annum, payable in full seven (7) years from the date hereof as herein provided. Principal and interest shall be payable in lawful money of the United States of America, at such place as the Payee may designate in writing. There shall be no penalty for prepayment of all or part of the principal of this Note. This Full Recourse Note is made and delivered in accordance with that Purchase Agreement of even date thereof, the terms of which are by this reference incorporated herein. DUE DATE: $    , or the unpaid balance thereof, shall be due on or before the     day of      , 19  . SIGNED: Maker Maker *306 APPENDIX C The following tables list the deductions, credits, and losses taken by each petitioner in connection with their MVR investment: Total
Investment
Year
Income
Depreciation
Interest
Deductions
Tax Credit
Losses
Robert L. & Leona M. Chester - #14299-84
1980
8,929.00
8,929.00
12,500.00
8.929.00
1981
4,933.60
19,345.16
4,934.65
24,279.81
19,346.21
1982
14,803.65
19,345.16
13,922.45
33,267.61
18,463.96
Total
19,737.25
47,619.32
18,857.10
66,476.42
12,500.00
46,639.17
Nolen E. & Nadine C. Sherritze - #14324-84
1980
2,738.09
2,738.09
11,500.00
4,677.73
1981
4,539.69
18,710.31
4,540.64
23,250.95
18,711.26
1982
13,619.34
16,428.57
12,987.51
29,416.08
15,796.74
Total
18,159.03
37,876.97
13,438.15
51,315.02
11,500.00
39,185.73
Doris M. Guzman - #14325-84
1980
10,000.00
10,000.00
14,000.00
10,000.00
1981
5,521.20
21,666.66
5,522.37
27,189.03
21,667.25
1982
16,580.10
21,666.66
15,318.36
36,985.02
20,404.92
Total
22,101.10
53,333.32
20,840.73
74,174.05
14,000.00
52,072.17
Billy J. & Thelma Ledford - #14328-84
1980
27,857.07
27,875.07
13,000.00
27,857.07
1981
15,395.80
29,172.01
5,128.37
34,300.38
29,670.55
1982
4,629.83
14,594.18
13,906.32
28,500.50
13,104.70
1983
16,327.44
14,594.18
9,141.17
23,735.35
7,407.91
Total
36,353.07
86,217.44
28,157.86
114,393.30
13,000.00
70,632.32
Donald E. & Virginia M. Kifer - #14329-84
1980
37,142.84
37,142.84
13,000.00
37,142.84
1981
5,133.78
26,530.60
5,134.86
31,665.46
26,531.68
1982
15,395.79
13,265.31
14,333.02
27,598.33
12,202.54
Total
20,529.57
76,938.75
19,467.88
96,406.63
13,000.00
75,877.06
William D. & Dawn R. Moore - #15227-84
1980
7,142.84
7,142.84
2,500.00
7,142.84
1981
988.00
5,102.00
988.00
6,090.00
5,102.00
1982
2,961.00
3,644.00
2,789.00
6,433.00
3,472.00
Total
3,949.00
15,888.84
3,777.00
19,665.84
2,500.00
15,716.84
Theresa G. DeGraaf - #15228-84
1980
4,285.70
4,285.70
1,500.00
4,285.70
1981
594.12
1,785.71
594.24
2,379.95
1,785.83
1982
1,776.41
1,785,71
1,606.00
3,391.71
1,615.30
Total
2,370.53
7,857.12
2,200.24
10,057.36
1,500.00
7,686.83
Daniel R. & Martha L. Chester - #15240-84
1980
12,857.10
12,857.10
9,000.00
12,857.10
1981
3,551.65
22,040.82
3,552.40
25,593.22
22,041.57
1982
10,658.63
11,020.42
10,085.45
21,105.87
10,447.24
1983
11,303.61
11,020.42
6,365.92
17,386.73
6,082.73
Total
25,513.89
56,938.76
20,003.77
76,942.92
9,000.00
51,428.64
Gene R. & Dorothy J. Vaughn - #15915-84
1980
2,857.00
2,857.00
1,000.00
2,857.00
1981
393.98
2,040.84
393.98
2,434.82
2,040.84
1982
1,184.29
1,020.43
1,118.49
2,138.92
954.63
Total
1,578.27
5,918.27
1,512.47
7,430.74
1,000.00
10,750.31
James W. & Charlotte Strader - #15916-84
1980
4,285.68
4,285.68
3,000.00
4,285.68
1981
1,181.72
4,285.72
1,181.97
5,467.69
4,285.97
1982
3,553.00
4,286.00
3,282.00
7,568.00
4,015.00
Total
4,734.72
12,857.40
4,463.97
17,321.12
3,000.00
12,586.65
Carl A. & Rochelle A. Culpepper - #15932-84
1980
5,714.28
5,714.28
2,000.00
5,714.28
1981
788.00
4,082.00
788.00
4,870.00
4,082.00
1982
2,368.58
2,040.00
2,232.49
4,272.49
1,903.91
Total
3,156.58
11,836.28
3,020.49
14,856.77
2,000.00
11,700.19
Grider & Sally Thrasher - #15933-84
1980
4,500.00
1981
1,776.19
12,856.50
1,776.19
14,632.69
12,856.50
1982
5,329.30
9,183.85
4,841.90
14,025.75
8,696.45
Total
7,105.49
22,040.35
6,618.09
28,658.44
4,500.00
21,552.95
Joe D. & Carol L. Kuykendall - #20675-84
1980
24,762.00
24,762.00
13,000.00
24,762.00
1981
5,127.00
30,069.00
5,128.00
35,197.00
30,070.00
1982
15,395.80
15,033.80
13,993.05
29,026.85
14,172.62
Total
20,522.80
69,864.80
19,121.05
88,985.85
13,000.00
69,004.62
Billy O. & Dianne Urfer - #22153-84
1980
2,148.00
2,148.00
1,500.00
2,143.00
1981
594.00
3,675.00
594.00
4,269.00
3,675.00
1982
1,776.00
2,623.00
1,627.00
4,250.00
2,474.00
Total
2,370.00
8,446.00
2,201.00
10,667.00
1,500.00
8,292.00
Renita L. Johnston - #22336-84
1980
5,714.28
5,714.28
2,000.00
5,714.28
1981
788.00
4,082.00
788.00
4,870.00
4,082.00
1982
2,369.00
1,458.00
2,232.00
3,690.00
1,321.00
Total
3,157.00
11,254.28
3,020.00
14,274.28
2,000.00
11,117.28
*307 Footnotes
1. Appendix C lists the deductions, credits, and losses taken by each petitioner. ↩
2. There is also an additional issue in Docket #14325-84 involving the disallowance of a charitable contribution deduction.↩
3. Tent crusades are religious services conducted by a travelling evanglist. They are so called because they are literally held in a tent that is transported from site to site.↩
4. In Call v. Commissioner,T.C. Memo. 1985-318, we denied deductions and credits claimed by taxpayers involved in tax sheltered investment programs, very similar to the one here involved, marketed by Williams in Arizona. As we noted in Call, Williams was sued by the State of Arizona on behalf of the taxpayers in Call↩ for civil and criminal securities fraud and for false pretenses. A $5,800,000 judgment was entered against Williams on the civil charges. Williams pleaded guilty to the criminal charges and was in prison at the time of the trial of this case.
5. The use of the terms "paid," "payment," "purchase," or "investment" are used for convenience only and are not intended to represent any conclusion concerning the true nature of the transaction at issue. ↩
6. This is according to Daniel Chester's testimony. Respondent however questions whether the tapes were actually produced in 1980.↩
7. Stipulated into evidence are numerous contracts between JLM and DanKryst for the sale of various tapes all dated December 3, 1980.↩
8. JLM also sold tapes to an organization called I Peter 1:25 ("First Peter"), and one called Cyndrea, Inc. ("Cyndrea").↩
9. All section references are to the Internal Revenue Code of 1954, as amended, and in effect during the taxable years at issue.↩
10. Once DanKryst received an investor's downpayment, it forwarded 50 percent of the downpayment to JLM as its downpayment to JLM.↩
11. Davis stated that he formed SWEET in 1980. However the evidence shows that the formation may not have been valid until March 3, 1981, at which time Davis removed his children from their positions as officers of SWEET.↩
12. This fee was actually paid to SWEET by DanKryst.↩
13. Respondent argues that little or no editing was ever performed on the tapes.↩
14. Rentals of tapes and equipment to individuals not involved in the promotion of the video program totalled no more than $2,624.43 for the years 1981, 1982, and 1983.↩
15. Beginning in 1982, these funds were transferred by wire transfer. This addition to tax was asserted in respondent's Second Amendment to Answer. [1]6 For example, on September 12, 1981, DanKryst paid $12,000 to JLM on its notes. JLM paid $12,000 to SWEET.SWEET then paid $10,875 to DanKryst. [1]7 SWEET issued Forms 1099 to the investors that reflected that the amounts transferred to DanKryst were income from the MVR.↩
18. The deficiencies for the years 1977, 1978 and 1979, and in some cases for the years 1981 and 1982, are based on disallowances of carrybacks and carryforwards of unused losses and credits claimed for the year 1980.↩
19. This provision was subsequently changed so that SWEET turned all of the proceeds from editing the tapes over to DanKryst to apply as above, but was to be paid $1,500 per tape for services.↩
20. We do not have adequate proof of how these funds were divided.↩
21. See Appendix C which lists the deductions and credits taken by each petitioner, and the losses reported.↩
22. We think these reports were not prepared in conjunction with the product of the tapes but were prepared in anticipation of trial. We are not convinced that the items listed were the actual costs incurred.↩
23. We do not, however, agree with respondent's expert witness, Gloria R. Mosesson, that the tapes had a zero value. Mosesson's opinion that the tapes had a zero value is belied by the fact that some of them were leased or sold. We do not believe Mosesson was too well qualified to determine what would appeal to people with religious bents living in the mountains and countryside of Arkansas and the surrounding area.↩
24. Because we have held that the notes were nonrecourse and lacking in economic substance, we agree with respondent that petitioners were not at risk pursuant to section 465, with respect to their investments. Porreca v. Commissioner, 86 T.C.     (April 28, 1986); Waddell v. Commissioner,↩ 86 T.C.     (April 28, 1986). Without the notes, the only amounts at risk for petitioners were their nominal cash payments of amounts from $10 to $100.
25. Moreover, due to our finding that the promissory notes were nonrecourse notes, petitioners would have had very little basis for purposes of depreciation. Depreciation deductions are not predicated on legal title but rather on one's actual investment in property. Mayerson v. Commissioner,47 T.C. 340, 350 (1966). If the purchase price and the principal amount of a nonrecourse note unreasonably exceed the value of the property acquired, the note does not represent "genuine indebtedness," or an actual investment in property and is therefore not included in one's basis. Estate of Franklin v. Commissioner,544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Odend'hal v. Commissioner,80 T.C. 588, 604 (1983) affd. on this issue 748 F.2d 908↩ (4th Cir. 1984). Aside from the notes executed by petitioners, the only other cost to petitioners, and hence source of basis, was the nominal cash payments made by petitioners.
26. We also think respondent's arguments that the tapes were not in use in 1980 and that no payments of interest were made in 1980 merit consideration. The evidence suggests that the JLM program did not get underway until December of 1980. While there are stipulated into evidence numerous contracts between JLM and DanKryst for the sale of various tapes, all dated December 3, 1980, it is also stipulated that Don Lyon, Inc., the predecessor of DanKryst, did not change its name to DanKryst, Inc. until July 13, 1981. There appears to have been little or no activity with regard to the tapes prior to February 1981. We are also at a loss to understand what funds were used by petitioners to pay interest in 1980. The tapes did not produce any revenue in 1980 and petitioners' cash tax refunds were not available until after 1980. There is no evidence that petitioners made direct payments of interest to DanKryst in 1980. Petitioners had the burden of proving these points, and failed to do so.↩
2. In his answer respondent asserted an increased deficiency of $385 pursuant to section 6214(a). ↩
3. This addition to tax was asserted in respondent's Second Amendment↩ to Answer.